# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

<table>
<tr><td>

OMNI BRIDGEWAY LIMITED,

     *Plaintiff*,

    v.

MINISTRY OF INFRASTRUCTURE
AND ENERGY OF THE REPUBLIC
OF ALBANIA, *et al.*,

     *Defendants*.

</td><td>

Civil Action No. 23-1938 (LLA)

</td></tr>
</table>

## <u>MEMORANDUM OPINION</u>

Plaintiff Omni Bridgeway Limited ("Omni Bridgeway") brings this action against the Ministry of Infrastructure and Energy of the Republic of Albania ("MIE"), the National Agency of Natural Resources of the Republic of Albania ("AKBN"), and Albpetrol Sh.A ("Albpetrol") (collectively, "Defendants"). ECF No. 1. Omni Bridgeway seeks to confirm and enforce an arbitral award rendered in favor of its predecessor in interest—GBC Oil Company Limited ("GBC Oil")— against all three Defendants. Pending before the court is Omni Bridgeway's Motion for Default Judgment. ECF No. 13. For the reasons explained below, the court will grant the motion and confirm the petition.

## I.    BACKGROUND

The court draws the following facts from Omni Bridgeway's pleadings, motion for default judgment, and various attachments. *See Owens v. Republic of Sudan*, 826 F. Supp. 2d 128, 134-35 (D.D.C. 2011); *Crescent Petroleum Co. Int'l v. Nat'l Iranian Oil Co.*, No. 22-CV-1361, 2024 WL 1885498 (D.D.C. Apr. 30, 2024).

## A.    The Relevant Agreements and Subsequent Breach

In July 2007, the Albanian Ministry of Economy, Trade and Energy ("METE"),[1] represented by subsidiary government agency AKBN, entered into three licensing agreements with Albpetrol, an entity wholly owned by the Albanian government.  ECF No. 1 ¶¶ 12, 19-20.  The agreements sought to develop three oilfields in Albania: the Cakran-Mollaj Oilfield, the Gorisht-Kocul Oilfield, and the Ballsh-Hekal Oilfield.  *Id.* ¶¶ 19-20.  The agreements are materially identical to one another.  *See* ECF Nos. 1-4 to 1-6; ECF No. 13, at 2; ECF No. 1 ¶ 20.  In pertinent part, the agreements authorized Albpetrol to transfer its development rights to any "foreign or local juridical person . . . with which Albpetrol wishes to cooperate."  ECF No. 1 ¶ 21 (alteration in original).  Albpetrol subsequently entered into three separate petroleum agreements with Stream Oil & Gas Limited, a foreign investor that is now known as GBC Oil Company Limited.  *Id.* ¶ 22; ECF Nos. 1-7 to 1-9.  All three petroleum agreements state that Albpetrol shall "transfer all its rights, privileges and obligations under the Licen[s]e Agreement . . . to Stream."  ECF No. 1-7, at 53; ECF No. 1-8, at 53; ECF No. 1-9, at 53.[2]  In other words, GBC Oil assumed all Albpetrol's rights under the licensing agreements.  ECF No. 1 ¶ 4.

The petroleum agreements include as Section 18.3 a provision titled "Governing Law," which requires the parties to "immediately amend" the petroleum and licensing agreements in the event that the "economic benefits" accrued by the contractor "are negatively influenced" by "any

---

[1] The Albanian government reorganized several of its agencies throughout the duration of this dispute.  When the initial contracts were written, METE was responsible for regulating the country's oil and gas industry.  ECF No. 1 ¶¶ 9-10.  In 2013, this responsibility was reassigned to the Ministry of Energy and Industry of the Republic of Albania ("MEI").  *Id.*  In 2017, the responsibility was moved once more to MIE.  *Id.*  That agency retains control of the oil and gas industry today.  *Id.*

[2] For ease of reference, all page numbers cited in ECF Nos. 1-4, 1-5, 1-6, 1-7, 1-8, and 1-9 refer to the ECF-labeled page numbers.

change in the laws, rules, and regulations of Albania." ECF No. 1-7, at 31; ECF No. 1-8, at 31; ECF No. 1-9, at 31. Similarly, the licensing agreements contain as Section 3.1 a provision stating:

> [I]f . . . any right or benefit granted (or which is intended to be granted) to LICENSEE under this License Agreement is infringed in some way, a greater obligation or responsibility shall be imposed onto LICENSEE or, in whatever other way the economic benefits accruing to LICENSEE from this License Agreement are negatively influenced by [Albanian law] . . . the Parties will immediately amend this License Agreement, or the AKBN and the [METE] will immediately undertake other necessary actions to eliminate the negative economic effect on the LICENSEE.

ECF No. 1-4, at 16; ECF No. 1-5, at 16; ECF No. 1-6, at 16. The licensing agreements require that "[a]ll disputes arising in connection with [these] [l]icense [a]greement[s] between AKBN, Albpetrol and foreign partner(s) shall be finally settled under the Rules of Conciliation and Arbitration of the International Chamber of Commerce ('ICC')" in Zurich, Switzerland in accordance with Swiss law.[3] ECF No. 1-4, at 64-65, 67; ECF No. 1-5, at 64-65, 67; ECF No. 1-6, at 64-65, 67. They further specify that "[t]he Ministry and AKBN irrevocably waive any right of immunity or any right to object to this arbitration agreement, any arbitration award, any judgment regarding the enforcement of an arbitration award o[r] the execution of any arbitration award against or in respect of any of its property whatsoever it now has or may acquire in the future in any jurisdiction." ECF No. 1-4, at 65; ECF No. 1-5, at 65; ECF No. 1-6, at 65.

At the time the contracts went into effect, oilfield operators in Albania paid one tax—on petroleum profits—to the government. ECF No. 1 ¶ 27; ECF No. 1-2 ¶ 322. Over the next few years, the operating environment changed. The Albanian government imposed more taxes, including a royalty tax of 10% on the sale value of available petroleum production, carbon taxes, and

---

[3] The agreements include a separate provision governing dispute resolution between AKBN and Albpetrol alone—those disputes are to be settled by arbitration in Albania and governed by Albanian law. ECF No. 1-4, at 64, 67; ECF No. 1-5, at 64, 67; ECF No. 1-6, at 64, 67.

circulation taxes.  ECF No. 1 ¶ 28; ECF No. 1-2 ¶ 322-24.  GBC Oil alleged that, under the licensing agreements, MIE and AKBN were required to "neutralize the negative economic impact of the government's tax changes," but that they never did.  ECF No. 1 ¶ 29.  Eventually, the Albanian government reclaimed possession of all three oilfields.  *Id.* ¶ 31.

## B.     The Arbitration

In March 2017, pursuant to the licensing agreements, GBC Oil filed a request for arbitration with the ICC's International Court of Arbitration.  *Id.* ¶ 32.  It sought damages for MIE's and AKBN's failure to neutralize the negative economic effect of the taxes, as well as compensation for the confiscation of the oil fields.  *Id.* ¶ 33.  MIE, AKBN, and Albpetrol appeared at the arbitration and were represented by experienced counsel throughout the proceedings.  *Id.* ¶ 35.

In July 2020, the arbitration tribunal issued its final award, largely in favor of GBC Oil.  *See generally* ECF No. 1-2.  It rejected Defendants' arguments that the arbitration clause was invalid and concluded that it had jurisdiction over the dispute.  *Id.* ¶¶ 330-74, 427-55.  Of particular note, Defendants suggested that the clause was unenforceable because there "was a mismatch between the parties who signed the agreements and the parties identified in the arbitration clause."  ECF No. 1 ¶ 42.  While the licensing agreements were signed by and explicitly mention AKBN, Albpetrol, and foreign partners, they do not mention MIE.  ECF No. 1-2 ¶ 583.  METE, however, is listed. The tribunal reasoned that because MIE is the legal successor to MEI, which was itself a successor to METE, MIE was clearly bound by the arbitration provision.  *Id.*  The tribunal was guided by the content and context of the licensing agreements in reaching this conclusion.  *Id.* ¶¶ 576-612.

On the merits, the tribunal found that MIE and AKBN had breached the licensing agreements when they failed to neutralize the negative impact of additional taxes.  *Id.* ¶¶ 813-51.  However, it rejected GBC Oil's claims related to the reclamation of the oil fields for lack of jurisdiction.  *Id.*

¶¶ 1210-64, 1360-69. Ultimately, the tribunal awarded GBC Oil $12,577,852.10 in damages against MIE and AKBN, with no interest, and costs in the amount of $292,760 and €14,451.68, to accrue interest at a rate of 5% from the date of the award until full payment is made. *Id.* ¶¶ 1378-95, 1430-31. Several months later, the tribunal issued an Addendum to the award clarifying that MIE and AKBN were jointly and severally liable for the damages award, and that MIE, AKBN, and Albpetrol were jointly and severally liable for costs. ECF No. 1-3.

In May 2023, GBC Oil assigned its rights under the arbitration award to Omni Bridgeway. ECF No. 1 ¶ 51.

### C.    This Action

In July 2023, Omni Bridgeway brought this petition to confirm the arbitration award under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards ("New York Convention"), June 10, 1958, 21 U.S.T. 2517, and the Federal Arbitration Act ("FAA"), 9 U.S.C. § 201 *et seq.* ECF No. 1.

Omni Bridgeway began attempting to serve Defendants that same month. ECF No. 6, at 2. It sent copies of the request form, summonses, petition, and other supporting documentation to Albania's Ministry of Justice via FedEx. *Id.* FedEx reported the hard copies as delivered shortly thereafter. *Id.* Omni Bridgeway also sent a courtesy copy of the documents to the Ministry of Justice via email. *Id.* It received no confirmation other than a "read receipt" from the email. *Id.* In August, Omni Bridgeway sent a demand letter and another copy of the petition to the Ministry of Justice, and it also sent the materials to the Albanian Prime Minister's Office, State Advocate's Office, and Ministry of Finance and Economy. *Id.* In October, still lacking confirmation of service, Omni Bridgeway sent a follow-up letter via FedEx and email to the Ministry of Justice requesting a status update. *Id.* In November, the Ministry of Justice responded to Omni Bridgeway with a

letter explaining that it had sent the service packets to the Court of First Instance of General Jurisdiction in Tirana, Albania for service on Defendants.  *Id.*

In January 2024, Omni Bridgeway sent yet another letter to the Ministry of Justice requesting that it furnish a certificate of service.  ECF No. 13, at 8-9.  FedEx confirmed delivery of that letter.  *Id.* Since then, the Ministry of Justice has not furnished any proof of service to Omni Bridgeway.  *Id.* In fact, it has not communicated with Omni Bridgeway at all aside from the November 2023 letter. *Id.*

In February 2024, Omni Bridgeway filed an affidavit for default in this action.  ECF No. 9. The Clerk of Court subsequently entered default as to all three Defendants.  ECF Nos. 10 & 11; *see* Fed. R. Civ. P. 55(a).  In March, Omni Bridgeway attempted to serve the Clerk's entry of default and the other petition documents on Defendants via FedEx.  ECF No. 12 ¶ 3.  FedEx reported the hard copies as delivered later that month, *id.* ¶¶ 4-6, but Defendants have still not appeared in the action.  Omni Bridgeway now moves for default judgment.  ECF No. 13.

## II.    LEGAL STANDARD

"[T]he Federal Rules of Civil Procedure provide for default judgments . . . [to] safeguard plaintiffs 'when the adversary process has been halted because of an essentially unresponsive party,'" and to protect the "the diligent party . . . lest he be faced with interminable delay and continued uncertainty as to his rights."  *Mwani v. bin Laden*, 417 F.3d 1, 7 (D.C. Cir. 2005) (quoting *Jackson v. Beech*, 636 F.2d 831, 836 (D.C. Cir. 1980)).

Federal Rule of Civil Procedure 55 requires a plaintiff to complete two steps to obtain a default judgment.  *See* Fed. R. Civ. P. 55.  First, the plaintiff must ask the Clerk of the Court to enter default based on a defendant's failure "to plead or otherwise defend" in response to the complaint.  Fed. R. Civ. P. 55(a).  Upon entry of default, the "defaulting defendant is deemed to

admit every well-pleaded allegation in the complaint." *Robinson v. Ergo Sols., LLC*, 4 F. Supp. 3d 171, 178 (D.D.C. 2014) (quoting *Int'l Painters & Allied Trades Indus. Pension Fund v. R.W. Amrine Drywall Co.*, 239 F. Supp. 2d 26, 30 (D.D.C. 2002)); *see Adkins v. Teseo*, 180 F. Supp. 2d 15, 17 (D.D.C. 2001). Second, after the Clerk has entered default, the plaintiff must file a motion for default judgment and provide notice of the same to the defaulting party. Fed. R. Civ. P. 55(b)(2).

Even once a plaintiff has completed these steps, "entry of a default judgment is not automatic," particularly when a foreign sovereign is involved. *Mwani*, 417 F.3d at 6. Cases involving foreign sovereigns are governed by the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1608 *et seq.*, which prohibits courts from entering a default judgment against a foreign state or instrumentality "unless the claimant establishes his claim or right to relief by evidence satisfactory to the court." *Id.* § 1608(e)[4]; *Jerez v. Republic of Cuba*, 775 F.3d 419, 422 (D.C. Cir. 2014). A court must satisfy itself that it has both subject-matter jurisdiction over the claims, personal jurisdiction over the absent parties, and that the plaintiff has established its right to relief under federal or state law. *Mwani*, 417 F.3d at 6; *see*, *e.g.*, *Lee v. Islamic Republic of Iran*, 656 F. Supp. 3d 11, 22 (D.D.C. 2023); *Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48, 56 (D.D.C. 2018); *Force v. Islamic Republic of Iran*, 464 F. Supp. 3d 323, 336 (D.D.C. 2020).

### III.    DISCUSSION

#### A.    Rule 55 Requirements

At the threshold, Omni Bridgeway must comply with Rule 55's requirements to ask the Clerk of the Court to enter default, and, upon entry of default, to file a motion for default judgment

---

[4] This same standard applies to default judgments against the United States under Federal Rule of Civil Procedure 55(e). *Hill v. Republic of Iraq*, 328 F.3d 680, 683 (D.C. Cir. 2003).

and provide notice of the same to the defaulting party.  Fed. R. Civ. P. 55.  It has done both.  ECF Nos. 9 to 13.  Accordingly, the court proceeds to the next steps in the analysis.

### B.    Subject-Matter Jurisdiction

The FSIA provides that "a foreign state shall be immune from the jurisdiction of the courts of the United States" unless one of its exceptions applies.  28 U.S.C. § 1604; *see Samantar v. Yousuf*, 560 U.S. 305, 313-14 (2010) (explaining that the FSIA is the "sole basis for obtaining jurisdiction over a foreign state in federal court" (quoting *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 439 (1989))).  Omni Bridgeway brings its claim against three Albanian government entities: MIE and AKBN, which are both "primary organ[s] of the Albanian Government" responsible for regulation and oversight of Albania's oil and gas industry; and Albpetrol, a gas entity fully owned by the Albanian government.  ECF No. 1-2 ¶ 40.  Each qualifies for protection under the FSIA and is thus "presumptively immune from the jurisdiction of United States courts."  *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993); *see* 28 U.S.C. §§ 1603(a) (defining a "foreign state" under the FSIA to include "political subdivision[s] . . . or agenc[ies]"), 1603(b) (defining an "agency or instrumentality of a foreign state" to include corporations that are majority owned by the foreign state).

Omni Bridgeway argues that two exceptions to immunity apply: the waiver exception and the arbitration exception.  ECF No. 13, at 10-14.  Because the court concludes that the arbitration exception applies, it need not address the waiver exception.  *See Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 489 (1983) ("If *one* of the specified exceptions to sovereign immunity applies, a federal district court may exercise subject matter jurisdiction" (emphasis added)).

Under the arbitration exception, a foreign state is not immune under the FSIA in

> any case . . . in which the action is brought . . . to confirm an award made pursuant to . . . an agreement to arbitrate, if . . . the agreement

> or award is or may be governed by a treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards.

28 U.S.C. § 1605(a)(6)(B).  "To proceed under this clause of the FSIA's arbitration exception . . . a district court must find three 'jurisdictional facts': (1) an arbitration agreement, (2) an arbitration award, and (3) a treaty potentially governing award enforcement." *NextEra Energy Glob. Holdings B.V. v. Kingdom of Spain*, 112 F.4th 1088, 1100 (D.C. Cir. 2024).  Omni Bridgeway has established all three.  The second fact can be disposed of quickly because Omni Bridgeway submitted the relevant arbitration award to the court with its petition.  ECF No. 1-2.  *See VAMED Mgmt. und Serv. GMBH v. Gabonese Republic*, No. 22-CV-3737, 2024 WL 1092232, at *3 (D.D.C. Mar. 13, 2024) (explaining, in a default judgment case, that a petitioner's submission of the arbitral award generally "demonstrate[s] the [second] jurisdictional fact[]," especially when the defaulting party "has not appeared in th[e] case" and therefore "does not dispute [the submissions'] authenticity").  The court addresses the first and third fact in turn.

### 1.    The Arbitration Agreements

Under the first factor, the court must "identify the relevant arbitration agreement." *NextEra Energy*, 112 F.4th at 1101.  "[T]he FSIA requires 'an agreement made by the foreign state'—*either* 'with' *or* 'for the benefit' of a private party—to submit certain disputes to arbitration." *Id.* (quoting 28 U.S.C. § 1605(a)(6)).  Omni Bridgeway relies on the licensing agreements to satisfy this jurisdictional fact.  Specifically, it points to the requirement within the agreements that "[a]ll disputes arising in connection with this . . . Agreement between AKBN, Albpetrol and foreign partner(s) shall be finally settled" by arbitration.  ECF No. 1-4, at 64-65; ECF No. 1-5, at 64-65; ECF No. 1-6, at 64-65.  As previously stated, Albpetrol later entered into three petroleum agreements with GBC

Oil, through which GBC Oil took on Albpetrol's rights under the licensing agreements.  ECF No. 1-7, at 53; ECF No. 1-8, at 53; ECF No. 1-9, at 53; ECF No. 1 ¶ 4.

Both the licensing agreements and the subsequent petroleum agreements are for the benefit of a private party because they provide rights to GBC Oil—a private party, ECF No. 1 ¶ 8—to "develop the three oilfields and [to obtain] the distribution of profits from them," *id.* ¶ 23 (citing ECF Nos. 1-7 to 1-9).  Each Defendant is a party to the relevant agreement to arbitrate.  The licensing agreements were entered into by the "[t]he Ministry of Economy, Trade and Energy as Represented by [AKBN]" and Albpetrol.  ECF No. 1-4, at 1; ECF No. 1-5, at 1; ECF No. 1-6, at 1.  The petroleum agreements were then entered into by Albpetrol and GBC Oil.  ECF No. 1-7, 1; ECF No. 1-8, at cover page; ECF No. 1-9, at cover page.  Accordingly, AKBN, Albpetrol, and GBC Oil are all plainly named parties.  And, although MIE is not explicitly named, it is still a party to the agreement because it is the legal successor to METE, which is a signatory to the agreement.  *See Gretton Ltd. v. Republic of Uzbekistan*, No. 18-CV-1755, 2019 WL 3430669, at *5 (D.D.C. July 30, 2019) (noting that courts have "time and again found jurisdiction over arbitration assignees' confirmation suits").

### 2.    A Treaty

Omni Bridgeway argues that the arbitration award is governed by the New York Convention. ECF No. 13, at 14.  The court agrees.  "The Federal Arbitration Act ('FAA') codifies an international convention known as the New York Convention into U.S. law."  *Africard Co. v. Republic of Niger*, 210 F. Supp. 3d 119, 123 (D.D.C. 2016).  "[T]he New York Convention 'is exactly the sort of treaty Congress intended to include in the arbitration exception'" to the FSIA.  *Creighton Ltd. v. Gov't of the State of Qatar*, 181 F.3d 118, 123-24 (D.C. Cir. 1999) (quoting *Cargill Int'l S.A. v. M/T Pavel Dybenko*, 991 F.2d 1012, 1018 (2d Cir. 1993)).  With a limited exception for certain

domestic arbitrations that is not relevant here, the New York Convention covers arbitration agreements and awards "arising out of a legal relationship, whether contractual or not, which is considered as commercial." 9 U.S.C. § 202. Typically, "awards fall under the New York Convention (and thus can be enforced under the FAA) where '(1) there is a written agreement; (2) the writing provides for arbitration in the territory of a signatory of the convention; (3) the subject matter is commercial; and (4) the subject matter is not entirely domestic in scope.'" *Crescent Petroleum*, 2024 WL 1885498, at *4 (quoting *Africard Co.*, 210 F. Supp. 3d at 123).

Here, there are written agreements to arbitrate in each licensing agreement. ECF No. 1-4, at 64-65; ECF No. 1-5, at 64-65; ECF No. 1-6, at 64-65. The writings provide that arbitration will occur in Switzerland, which is a signatory to the New York Convention. ECF No. 1-4, at 64-65; ECF No. 1-5, at 64-65; ECF No. 1-6, at 64-65; *Contracting States*, New York Convention.[5] The subject matter of the licensing agreements is commercial, because the agreements relate to the private development of several Albanian oil fields. *See Belize Soc. Dev. Ltd. v. Gov't of Belize*, 794 F.3d 99, 105 (D.C. Cir. 2015) (explaining that "commercial" under the New York Convention means to "have a connection to commerce"); ECF Nos. 1-4 to 1-6. Finally, the subject matter is not domestic in scope because the agreements deal with property located in Albania and the parties to the dispute are internationally based. ECF No. 1 ¶¶ 7-12 (listing each party, none of which is based in the United States). Accordingly, the third "jurisdictional fact" required for invocation of the arbitration exception is satisfied. *See NextEra Energy*, 112 F.4th at 1100. Thus, the court may exercise subject-matter jurisdiction.

---

[5] *Available at* https://perma.cc/UV3L-ZAWS.

### C.    Personal Jurisdiction and Venue

Once the court assures itself that it has subject-matter jurisdiction, it must next assess whether it has personal jurisdiction over the defendants. *See, e.g.*, *Lee*, 656 F. Supp. 3d at 22; *Fritz*, 320 F. Supp. 3d at 56. The FSIA provides that "[p]ersonal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have [subject-matter] jurisdiction . . . [and] where service has been made" properly. 28 U.S.C. § 1330(b); *see Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 95 (D.C. Cir. 2002) ("[U]nder the FSIA, 'subject matter jurisdiction plus service of process equals personal jurisdiction[.]'" (quoting *Prac. Concepts, Inc. v. Republic of Bolivia*, 811 F.2d 1543, 1548 n.11 (D.C. Cir. 1987))).

The FSIA outlines the proper procedure for the service of a foreign sovereign and requires "strict adherence" to its terms. *Barot v. Embassy of the Republic of Zambia*, 785 F.3d 26, 27 (D.C. Cir. 2015) (quoting *Transaero, Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148, 154 (D.C. Cir. 1994)). "The FSIA prescribes four methods of service, in descending order of preference. Plaintiffs must attempt service by the first method (or determine that it is unavailable) before proceeding to the second method, and so on." *Owens*, 826 F. Supp. 2d at 148 (quoting *Ben-Rafael v. Islamic Republic of Iran*, 540 F. Supp. 2d 39, 52 (D.D.C. 2008)). In brief, the four methods of service are: (1) "in accordance with any special arrangement for service between the plaintiff and the foreign state or political subdivision"; (2) "by delivery of a copy of the summons and complaint in accordance with an applicable international convention on service of judicial documents"; (3) by sending one copy of the relevant materials to the Clerk of Court to be "dispatched . . . to the head of the ministry of foreign affairs of the foreign state concerned"; and (4) by sending two copies of the relevant materials to the Clerk of Court to be "dispatched . . . to the Secretary of State . . . [who] shall transmit one copy of the papers through diplomatic channels to the foreign state." 28 U.S.C. § 1608(a).

Only the first two methods of service are at issue here.  With regard to the first method of service, Omni Bridgeway asserts that no "special arrangement for service" exists between it and Defendants, ECF No. 13, at 16, making this method unavailable.

As to the second method, the United States and Albania are both signatories to the Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters ("Hague Service Convention").  *Saint-Gobain Performance Plastics Eur. v. Bolivarian Republic of Venezuela*, 23 F.4th 1036, 1038-39 (D.C. Cir. 2022); *Status Table*, Hague Conf. on Priv. Int'l L.[6]  "The 'primary innovation' of the Hague Service Convention—set out in Articles 2 through 7—is that it 'requires each state to establish a central authority to receive requests for service of documents from other countries.'"  *Water Splash, Inc. v. Menon*, 581 U.S. 271, 275 (2017) (quoting *Volkswagenwerk Aktiengesellschaft v. Schlunk*, 486 U.S. 694, 698 (1988)).  A judicial officer in the United States—including an attorney—may forward service documents to a recipient state's designated Central Authority.  Hague Service Convention, art. 3; *Micula v. Gov't of Romania*, No. 17-CV-2332, 2018 WL 10196624, at *4 (D.D.C. May 22, 2018) (explaining that a party's own attorney may serve as a forwarding authority under the Hague Service Convention).  After the Central Authority receives a request for service, it must serve the documents "by a method prescribed by [the receiving state's] internal law" or "by a particular method requested by the applicant" that is compatible with that law.  Hague Service Convention, art. 5.  The Central Authority must then "complete a certificate" verifying "that the document has been served."  *Id.*, art. 6.

Article 15(1) of the Hague Service Convention prohibits entry of a default judgment where the foreign defendant "has not appeared" until the document is served according to the receiving

---

[6] *Available at* https://perma.cc/2RPY-L5VU.

state's internal law or is "actually delivered to the defendant or to his residence by another method provided for by [the Hague Service Convention]." *Id.*, art. 15. "[N]otwithstanding" Article 15(1), Article 15(2) provides that entry of a default judgment is permitted absent a certificate of service if:

> (a) [T]he document was transmitted by one of the methods provided for in [the] Convention,
>
> (b) a period of time of not less than six months, considered adequate by the judge in the particular case, has elapsed since the date of the transmission of the document, [and]
>
> (c) no certificate of any kind has been received, even though every reasonable effort has been made to obtain it . . . .

*Id.*

Omni Bridgeway has met the criteria for entry of a default judgment under Article 15(2). First, it properly served Defendants consistent with the Hague Service Convention and, by extension, the FSIA. In July 2023, Omni Bridgeway's attorney sent the relevant documents to Albania's designated Central Authority—its Ministry of Justice—by FedEx and email. ECF No. 7 ¶¶ 2-4; *see Albania – Central Authority & Practical Information*, Hague Conf. on Priv. Int'l L.[7] The physical address Omni Bridgeway used matches the Hague Service Convention records for Albania's Central Authority. *See Albania – Central Authority & Practical Information*, Hague Conf. on Priv. Int'l L.[8]; ECF Nos. 7-2 to 7-10. Omni Bridgeway's attorney is an acceptable forwarding agent, *Micula*, 2018 WL10196624, at *4 (collecting cases), and FedEx is an acceptable method of transmittal, *Koch Mins. Sàrl v. Bolivarian Republic of Venezuela*, 514 F. Supp. 3d 20, 35-36 (D.D.C. 2020). FedEx reported delivery of the hard copies at the end of July with a signed receipt.

---

[7] *Available at* https://perma.cc/WM6K-97WZ.

[8] *Available at* https://perma.cc/WM6K-97WZ.

ECF No. 7 ¶ 5; ECF No. 7-3.  The record thus supports that Omni Bridgeway attempted to serve Defendants consistent with Articles 2 through 7 of the Hague Service Convention.

Once the Albanian Ministry of Justice received Omni Bridgeway's materials, it should have then served Defendants and provided a certificate of service under Article 6 of the Hague Service Convention.  Hague Service Convention, art. 6.  *See Saint-Gobain Performance Plastics Eur.*, 23 F.4th at 1039.  When Omni Bridgeway did not receive a certificate of service after several months, it followed up in October 2023 to inquire about service.  ECF No. 7 ¶¶ 6-8.  The Ministry of Justice responded in November 2023 that it had forwarded the service packets to the Court of First Instance of General Jurisdiction in Tirania, Albania, for service on Defendants.  *Id.* ¶ 9; ECF No. 7-7, at 2. That is an acceptable method of service under Albanian law.  *See* ECF No. 7-7, at 2.

Still lacking any certificate of service from the Albanian Ministry of Justice or a response from Defendants, Omni Bridgeway sent another letter to the Ministry of Justice seeking to confirm that service had occurred in January 2024.  ECF No. 7-8.  The letter was marked as delivered by FedEx at the end of the month.  ECF No. 7 ¶ 12; ECF No. 7-10.  However, by the time Omni Bridgeway filed its motion in April 2024, it had still not received a certificate of service.  ECF No. 13-1 ¶ 4.

Omni Bridgeway suggests that, at this point, the court should turn to Article 15(2) to permit default where a certificate of service has not been provided.  The court agrees.  The D.C. Circuit has made clear that "[t]he plain text of . . . the [Hague Service Convention]" controls, because "[c]ourts must . . . adhere to the plain text when interpreting the FSIA's requirements for service given the 'sensitive diplomatic implications' of suits against foreign sovereigns."  *Saint-Gobain*, 23 F.4th at 1040-41 (quoting *Republic of Sudan v. Harrison*, 587 U.S. 1, 19 (2019)).  Omni Bridgeway has satisfied each of Article 15(2)'s criteria.  Specifically, it transmitted the relevant documents to

Albania's Central Authority, roughly eighteen months have elapsed between its transmission and the date of this opinion, but Omni Bridgeway has not received a certificate of service despite making "every reasonable effort" to obtain one.  *See* ECF No. 7.  Indeed, Omni Bridgeway has mailed and emailed the documents to Albania's central authority numerous times, but it has not been provided a certificate of service or any other form of confirmation of service.  *Id.*; *see Koch Mins.*, 514 F. Supp. 3d at 35 (concluding reasonable efforts had been made where the plaintiffs sent a follow-up notice).

Accordingly, the court concludes that Omni Bridgeway has shown that it has complied with its obligations under the Hague Service Convention such that the court has personal jurisdiction over Defendants.  *See Prac. Concepts, Inc.*, 811 F.2d at 1548 n.11; 28 U.S.C. § 1608(a)(2).[9]

### D.    Right to Relief

Finally, Omni Bridgeway must show that it is entitled to relief on the merits for its claim seeking confirmation of the arbitral award under the New York Convention.  *See Force*, 464 F. Supp. 3d at 336.  As previously stated, Omni Bridgeway must establish this by "evidence satisfactory to the court," 28 U.S.C. § 1608(e), which typically consists of affidavits and declarations, *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 20 (D.D.C. 2009).  The court concludes that Omni Bridgeway has met its burden.

First, Omni Bridgeway timely brought this action within three years of the award.  9 U.S.C. § 207.  The award was rendered on July 6, 2020, ECF No. 1-2, at 307, and this lawsuit was filed on July 5, 2023, ECF No. 1.  Next, it has provided the court with "[t]he duly authenticated original"

---

[9] The court is also satisfied that venue is proper in this District.  *See* 28 U.S.C. § 1391(f)(4) ("A civil action against a foreign state as defined in [the FSIA] may be brought . . . in the United States District Court for the District of Columbia if the action is brought against a foreign state or political subdivision thereof.").

or "duly certified copy" of both the award and the agreement under which the parties agreed to submit to arbitration. N.Y. Convention art. II, IV; *see* ECF Nos. 1-2 (award), 1-3 (award addendum), 1-4 to 1-6 (copies of licensing agreements), 1-7 to 1-9 (copies of petroleum agreements).

"Consistent with the 'emphatic federal policy in favor of arbitral dispute resolution' . . . the FAA affords the district court little discretion in refusing or deferring enforcement of foreign arbitral awards." *Belize Soc. Dev.*, 668 F.3d at 727 (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 631 (1985)). Indeed, the court is obligated to confirm an arbitral award unless one of seven statutory exceptions laid out in the New York Convention applies. 9 U.S.C. § 207; N.Y. Convention art. V. Five of the exceptions require the opposing party to submit "proof" in support of their position and do not apply in a default situation. *Id.* art. V(1). Thus, only two applicable exceptions would allow for the court to refuse enforcement: (1) "the subject matter of the difference is not capable of settlement by arbitration under the law[s]" of the United States; or (2) "the recognition or enforcement of the award would be contrary to the public policy of [the United States]." *Id.* art. V(2). Neither applies here. The underlying dispute "appears to arise out of a breach of contract, which is surely capable of settlement by arbitration in the United States." *Africard Co.*, 210 F. Supp. 3d at 127-28. The public policy exemption is also inapplicable in light of the United States' strong commitment to arbitral dispute resolution. *Mitsubishi Motors*, 473 U.S. at 631. The court is thus satisfied that Omni Bridgeway is entitled judgment on the merits.

### E.    Award Amount

Finally, the court must confirm the total amount due to Omni Bridgeway under the arbitral award.  The tribunal's award directed Defendants to pay the following sums:[10]

- MIE and AKBN, jointly and severally, the amount of $12,577,852.10 as monetary damages.  ECF No. 1-3, at 13.

- MIE, AKBN, and Albpetrol, jointly and severally, the amount of $292,760 and €14,451.68, with interest at a rate of 5% from the date of the award (July 6, 2020) until full payment is made.  *Id.*

Omni Bridgeway requests that the court convert the euro costs award to U.S. dollars.  ECF No. 13, at 27.  "Conversion of . . . foreign currency amounts into dollars at judgment is the norm, rather than the exception."  *Africard Co.*, 210 F. Supp. 3d at 128 (alteration in original) (quoting *Cont'l Transfert Tech., Ltd. v. Fed. Gov't of Nigeria*, 932 F. Supp. 2d 153, 158 (D.D.C. 2013)).  When making such a conversion, the court "must do so 'at such rate as to make the creditor whole and to avoid rewarding a debtor who has delayed in carrying out the obligation.'"  *VAMED Mgmt.*, 2024 WL 1092232, at *5 (quoting Restatement (Third) of Foreign Relations Law § 823(1) (1987)).  Thus, the court examines the exchange rate at the date of the award and the date of the judgment and selects the more favorable rate for the creditor.  *Id.*; *Africard Co.*, 210 F. Supp. 3d at 128-29.  "The Treasury Department 'provides the U.S. government's authoritative exchange rates' on a quarterly basis."  *VAMED Mgmt.*, 2024 WL 1092232 at *5 (quoting *Treasury Reporting Rates of Exchange*, U.S. Dep't of Treas.).  The award was rendered July 6, 2020, so the relevant exchange rate comes from the quarter ending September 30, 2020.  On that date, one U.S. dollar equaled 0.854 euro.  *Treasury Reporting Rates of Exchange*, U.S. Dep't of Treas.[11]  For the quarter ending

---

[10] The court points to the award addendum, which clarified that the sums are jointly and severally owed.  ECF No. 1-3, at 13.

[11] *Available at* https://perma.cc/8X8A-FLKY.

December 30, 2024, which is the most recent exchange rate, one U.S. dollar equals 0.961 euro. *Id.*[12]  Because the euro was stronger against the dollar in 2020 and thus more favorable to Omni Bridgeway at that time, the court will use the September 30, 2020 exchange rate.

The court also applies the interest rate called for in the award.  Doing so fulfills "the widely accepted, remedial purpose of . . . compensat[ing] the injured party for the loss of the use of money he would otherwise have had."  *Cont'l Transfer Tech.*, 932 F. Supp. 2d at 163 (internal quotation marks omitted) (quoting *Ministry of Def. & Support for the Armed Forces of the Islamic Republic of Iran v. Cubic Def. Sys., Inc.*, 665 F.3d 1091, 1102 (9th Cir. 2011)).  This practice "promotes settlement and deters any attempt to benefit unfairly from inevitable litigation delay."  *LLC SPC Stileks v. Republic of Moldova*, 985 F.3d 871, 881 (D.C. Cir. 2021) (quoting *Moore v. CapitalCare, Inc.*, 461 F.3d 1, 13 (D.C. Cir. 2006)).

There are two separate amounts that are subject to interest: $292,760, and €14,451.68.  ECF No. 1-3, at 13.  Exactly 1,659 days have elapsed since the arbitration award was issued.  Applying 5% annual interest to $292,760, running from the award date until today, results in a final amount of $367,453.90.  As for the second amount, €14,451.68, applying the euro-to-dollar exchange rate at the time the award was issued (0.854) yields $16,922.34.  Applying 5% annual interest over the course of 1,659 days increases this amount to $21,239.85.  Accordingly, Defendants must pay Omni Bridgeway the following sums:

- MIE and AKBN, jointly and severally, the amount of $12,577,852.10 as monetary damages.  ECF No. 1 3, at 13.  Per the tribunal's award, this amount was not subject to interest and therefore remains unchanged.

- MIE, AKBN, and Albpetrol, jointly and severally, the amount of $367,453.90 and $21,239.85, after accounting for interest.

---

[12] *Available at* https://perma.cc/ZYM7-S8ZN.

## IV.     CONCLUSION

For the foregoing reasons, the court will grant Plaintiff's Motion for Default Judgment, ECF No. 13, and Petition to Confirm the Arbitration Award, ECF No. 1, and it will enter judgment for Omni Bridgeway in the amount of $12,966,545.85.  A separate order will issue.

_____

LOREN L. ALIKHAN
United States District Judge

Date:   February 14, 2025